# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2673-24

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

J.A.W.D.,

     Defendant-Appellant,

and

F.P-L.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF O.C.D.,
a minor.

_____

Submitted January 5, 2026 – Decided March 23, 2026

Before Judges Natali and Bergman.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FG-16-0032-24.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Deric Wu, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Christopher Weber, Assistant Attorney General, of counsel; Nicholas Dolinsky, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor O.C.D. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Jennifer M. Sullivan, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

This matter concerns a Family Part order terminating the parental rights of J.A.W.D. (John) to his child O.C.D.[1] (Charlie). The New Jersey Division of Child Protection and Permanency (Division) initiated a complaint against John after concerns of physical abuse of the children in their family home, resulting in Charlie's removal and subsequent placement in foster care. After our review of the record and application of the relevant legal principles, we conclude the court did not err in its determination that the statutory criteria for termination of

---

[1] We use initials and pseudonyms to protect the parties' and child's confidentiality. R. 1:38-3(d).

parental rights set forth at N.J.S.A. 30:4C-15.1(a) were proven by the Division by clear and convincing evidence, and therefore, we affirm.

I.

Division Investigation and Removal of Children

John and F.P-L. (Fiona) are the biological parents of Charlie, born in Haiti in April 2012. John and S.O. (Sora) are the parents of Charlie's half-sister, M.D. (Mary), born in February 2015. After the birth of the children, John and the children moved to New Jersey while Fiona and Sora remained in Haiti.

On December 24, 2020, the Division began investigating John's family after his girlfriend A.G.'s (Amy) son, Chad, was found with unexplained severe abdominal injuries, leading to concerns of child abuse after medical findings suggested the injuries were non-accidental. The Division received a referral from Kinder Pediatrics Urgent Care (KPUC) with concerns for Chad after he was evaluated for abdominal pain. KPUC reported that Chad had an "enormously extended belly with bruising all over his abdomen," with additional bruising on his right side. Amy reported that the cause of Chad's bruising was from playing with other children. KPUC also reported that Chad had other bruising found on "the left lower jaw line and central forehead." Amy credited those injuries to Chad falling out of bed. KPUC found Amy's explanations

inconsistent with the extent and type of Chad's injuries. KPUC directed Amy to take Chad directly to an emergency room and they called the hospital reporting its concerns.

The Division's Special Protective Response Unit (SPRU) workers responded to the emergency room at Saint Joseph's Medical Center. Upon arrival, Chad was reported to appear uncomfortable, in pain, moving from side to side, and crying. SPRU workers also observed the bruises on his jawline, forehead, and abdomen. They photographed the injuries and contacted the Passaic County Prosecutor's Office. Later that evening, Chad underwent surgery to remove about one foot of his intestines found to be "dead muscle." The hospital expressed concerns that Chad's abdominal injury was "non-accidental" and "unexplained." Chad remained hospitalized for seven days and was eventually discharged on December 31, 2020.

There were conflicting accounts provided by Amy, Mary and Charlie to the Division, claiming Mary had allegedly hit Chad with a hammer, which both children later recanted, implicating John as the cause of Chad's injuries. John was subsequently arrested and charged with multiple criminal offenses relating to Chad's injuries, including aggravated assault, endangering the welfare of a child, witness tampering, and bribery.

A-2673-24

On January 11, 2021, the Division initiated a family neglect action and was granted temporary custody of Mary, Charlie and Chad, while John, Amy Sora, Fiona, and Chad's biological father, M.O. were named defendants. The Division implemented safety protection plans removing Mary, Charlie, and Chad from the home when inconsistent explanations about Chad's injuries emerged. The Division placed Mary and Charlie with their paternal grandmother, G.D. (Gina). On March 8, 2021, the Division moved Charlie and Mary from Gina's home after she advised the Division she was no longer able to care for them. Thereafter, the children were placed with various resource parents. Eventually, on January 11, 2022, Charles and Mary were placed in the non-relative resource home of B.H. (Beth).

In August 2023, because Mary exhibited behavioral issues, the Division placed her with another non-relative resource parent. Mary had to be moved again in January 2024 because her resource parent could not commit to caring for her long-term, and she was later placed in a residential treatment home due to behavioral and psychiatric issues that led to her placement.

While incarcerated, John had limited access to services; visitation was virtual and often contentious. Charlie repeatedly declined contact with John and

A-2673-24

expressed a desire not to engage with his biological family, preferring adoption by his resource parent, Beth.

Trial Court Proceedings

On October 19, 2023, the Division filed a complaint for guardianship of Mary and Charlie against John, Sora and Fiona. The family neglect litigation was terminated on November 6, 2023, and the court issued an Order to Show Cause under the guardianship litigation. Eventually, on August 6, 2024, the court issued a permanency order, approving a plan for termination of John's parental rights followed by adoption of Charlie by Beth. For Mary, however, the court approved a plan of termination of parental rights followed by "select home adoption," indicating the Division had not located an adoptive home for Mary. By January 8, 2025, the Division had changed its goal for Mary to reunification with John because the Division was unable to locate an adoptive home for her due to her behavioral and psychological issues. The court entered an order on the above date that found termination of John's parental rights was not in Mary's best interests because of these issues. The Division continued to pursue a permanency plan for termination of John's parental rights to Charlie followed by his adoption by Beth.

6

Shortly thereafter, a trial was held over six non-consecutive days between January 15 and March 7, 2025 concerning the termination of John's parental rights to Charlie. The Division presented testimony from permanency supervisor Chanel Falconer, who was assigned Charlie's case from January 2021 to July 2022; adoption supervisor Jorge Flaconi, who began working on Charlie's case starting from June 2022; Nakeisha Coglin, who was assigned as Charlie's adoption caseworker in October 2024; Dr. Alison Strasser Winston, the Divisions expert; and Beth. At the request of the Law Guardian, the court permitted Charlie to testify in-camera. The Division employees testified concerning the investigation and adoption process consistent with the information contained in the Division's files, which were entered into evidence.

Dr. Winston testified as an expert in psychology and bonding. She stated that she conducted psychological evaluations of Charlie in July 2024, and bonding evaluations of Charlie and Beth, as well as a psychological evaluation of John in August 2024. Dr. Winston testified she reviewed Division records, John's judgment of conviction, Charlie and Mary's prior evaluations and a certification of completion of a parenting course John participated in while incarcerated.

Dr. Winston found it significant that John denied all allegations of physical abuse of his children or Chad, despite statements from his children that he had done so. She observed that John had a significant tendency to minimize responsibility for the allegations and found John's denial of anger issues contradictory to what Mary and Charlie reported. John denied ever injuring Chad and asserted that Charlie fabricated the allegations against him because he was coerced. Despite pleading guilty to lesser charges, John was dismissive of the topic and told Dr. Winston that all charges against him were dropped. When confronted with Charlie and Mary's disclosures of physical discipline, John asserted he would use minimal physical discipline, like light spanking and taking away privileges.

Dr. Winston opined that because John was unwilling to accept any responsibility for what occurred to Chad, he was unlikely to engage in services to address his behavior, and if he did, he would only engage in them superficially. Dr. Winston found John's proposed parenting plan—involving his mother as support—insufficient because Charlie believed and had stated Gina had failed to provide support to him in the past.

Dr. Winston testified she administered four psychological tests to John: (1) a Personality Assessment Inventory (PAI), which assesses whether an

individual exhibits any mental health issues; (2) a Child Abuse Potential Inventory (CAPI) to assess John's risk of engaging in physically abusive behavior; (3) Adult-Adolescent Parenting Inventory (AAPI), which assesses different parenting attitudes and values; and (4) a Parenting Street Inventory (PSI), which looks at the interactions of the parent and child to see if any of those factors might contribute to dysfunctional parenting. The PAI revealed John had an elevated score on the paranoia subscale; meaning he tends to be suspicious and distrustful. Further the results indicated John tended to have a very positive self-concept, externalize responsibility and views himself as unassertive and does not have anger issues.

The AAPI revealed John had elevated scores on the "reverses family roles" metric; meaning he looks to his children to meet his needs rather than him meeting theirs. The CAPI assessment was invalidated because John provided defensive responses, but Dr. Winston found his responses consistent with his PAI. Dr. Winston also found John's defensive responses consistent with his tendency to minimize his responsibility for allegations of abuse.

Dr. Winston concluded that John could not provide minimally adequate parenting, and Charlie would suffer psychological harm if returned because John refuses to admit his behaviors, refuses to assume accountability and is not

willing to change. She recommended that John participate in anger management counseling, individual therapy, and parenting classes. She further recommended that John have therapeutically supervised visitation with Mary and if in Charlie's discretion, with Charlie as well. Dr. Winston found John's ability to improve his situation so that his children could be safely returned to him as "very poor" and "minimal." She similarly found John's ability to safely parent Charlie in the foreseeable future as "very poor."

Concerning Charlie, Dr. Winston stated she evaluated him using the Behavioral Assessment System for Children and the PAI for adolescents. Charlie's assessment results were all within the normal limits, finding he was an emotionally healthy and resilient adolescent. During his interview, Charlie disclosed that John physically abused him using different objects like belts, extension cords, and plastic action figures. Charlie indicated to Dr. Winston that he had grown out of fearing John. When referring to the incident involving Chad, Charlie disclosed when John came home Chad had been crying, so John took Chad into the bathroom and then he heard a bang. Chad then started to cry more and subsequently Charlie saw John hit him with a boot, then Chad started vomiting. After that, Chad continued vomiting for the next couple days and Charlie would have to stop his virtual learning to clean Chad's vomit. When

Charlie told the truth as to what had occurred, he stated that his grandmother, aunt and uncle did not believe him and were angry because they thought Charlie was the one who abused Chad and blamed it on John.

Dr. Winston concluded Charlie should not be compelled to attend therapy because he was currently asymptomatic. Furthermore, she based her conclusion on his results from psychological testing and performing well in school and at home. Dr. Winston opined that forcing Charlie to attend therapy would result in a resistant adolescent who will be angry and refuse to talk. Still, she acknowledged at some point in the future Charlie may require therapy to further address physical, emotional, and psychological abuse that he sustained from John.

Dr. Winston found Charlie's consistent position in having no interest to engage in visitation with his father significant because she worked with a lot of children who have been abused by their parents and "a lot of them still love their parents and . . . want to be with [them]." She opined "the fact that [Charlie] wants nothing to do with his father[] really speaks volumes to the level of trauma that he suffered in his father's case," and "[John] caused irreparable harm to their relationship."

11

In terms of bonding, Dr. Winston stressed that Charlie requires a person that he can rely on consistently for support and in turn, that person will respond in an appropriate, nurturing manner who will be emotionally and physically available to him. Additionally, she found Charlie requires a person he can turn to without being fearful of how they will react. Dr. Winston did not find a bonding evaluation with John necessary because an attachment develops when the caregiver is present and is consistently responding to the child's needs, which was not happening in Charlie's case. Furthermore, Dr. Winston opined if the child is refusing contact and in her interview with the child she was able to learn about why the child was refusing contact, a bonding evaluation would not be necessary. In this case, she was also concerned that performing a bonding evaluation with John would re-traumatize Charlie.

Dr. Winston testified on July 25, 2024, she conducted a bonding evaluation between Beth and Charlie. Based upon her observations, Dr. Winston found that Charlie had a secure emotional attachment to Beth and viewed her as his psychological parent. When interviewed by Dr. Winston, Beth indicated she desired to adopt Charlie, and Charlie indicated he wanted to be adopted by Beth. Dr. Winston opined that Charlie would not suffer any harm if John's parental rights were terminated, and a termination would be in Charlie's best interests

12

based upon what he had expressed to her concerning John and Beth. She found being adopted by Beth would allow Charlie to flourish and succeed because his wishes are being recognized and validated. Dr. Winston ultimately agreed with the Division's plan for Charlie to be adopted by Beth, finding it would be in Charlie's best interest.

Beth testified she is of Haitian descent like Charlie, and she had been a resource parent for the Division for eighteen plus years, but Charlie would be the first child she adopted. Additionally, Beth testified that Charlie is an "A" and "B plus" student, participates in sports year-round and they recently went on a vacation together.

Beth stated that if Charlie wished to resume contact with Mary, she would have no objection and support him one hundred percent. She also explained she would have no issue with Charlie contacting his birth mother; although Charlie indicated he no longer wanted to contact her and they had not been in contact since 2024. Additionally, Beth stated she would have no objection if Charlie wanted to participate in visits with John; however, she would respect Charlie's wishes if he continued not wanting to see him. Lastly, she stated if there was a recommendation for Charlie to go to therapy in the future, she would assist with his participation. Beth explained she could provide Charlie with everything he

13

needed through adoption, and he has expressed he no longer wants to be involved with anything from the past.

Charlie testified in-camera. He explained his desire to be adopted by Beth; that he lives in a safe area with her and has new friends. When asked by the court to describe his experience while living with John, Charlie described it as "aggravating" and "very chaotic." Charlie described John as "angry all the time" while living with him. When asked by the court what he felt like when John was arrested Charlie stated, "I thought he deserve[d] it . . . if you're going to do something . . . you have to [do] your time for what you did." Charlie stated he did not want to visit his father while he was incarcerated because he felt like it was a reward that his father was still able to see him and Mary. Additionally, Charlie stated he does not wish to visit his father now because although John claims he changed, Charlie believes he has not. Charlie clarified even if John could provide everything he wanted, he does not want to throw all the people he's built relationships with away simply because John is his father. Additionally, Charlie explained he no longer wants contact with his birth mother because she is on his father's side and tried to convince him to give John another chance.

Charlie also described his experience with Mary recently at a summer camp as "horrible." He stated that she reminds him of their dad, and she likes to be in command of things. When asked if Charlie had anything to say, Charlie responded "[p]lain and simple, I do not want to live with my dad or mom. I want to be adopted." When asked if Charlie feels that way because Beth feels that way, Charlie asserted "[b]ecause I feel that way."

After the conclusion of the trial, on April 3 and April 9, 2025, the court issued an oral decision finding the Division had met all four prongs of N.J.S.A. 30:4C-15.1 and entered an order terminating John's parental rights to Charlie.

On appeal, John argues the following points:

POINT I

DCPP'S LACK OF REASONABLE EFFORTS [WERE] MADE APPARENT WHEN [JOHN] COULD REASONABLY SUBMIT TO SERVICES IN JUNE.

POINT II

THE COURT'S EVALUATION OF [JOHN]'S ABILITY AND WILLINGNESS TO OVERCOME THE INITIAL RISK OF HARM SHOULD NOT HAVE BEEN BASED ON DR. WINSTON'S UNRELIABLE OPINIONS.

POINT III

IN THE ABSENCE OF COMPARATIVE BONDING EVALUATIONS, THE COURT DID NOT HAVE

15

SUFFICIENT EVIDENCE TO CONCLUDE THAT
TERMINATION OF [JOHN]'S PARENTAL RIGHTS
WOULD NOT DO MORE HARM THAN GOOD.

## II.

An appellate court's review of a Family Part judge's factual findings in a guardianship trial is limited. In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002). Those findings are "binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 412 (1998) (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). The court may reverse a factual finding only if there is "'a denial of justice' because the family court's 'conclusions are [ ] "clearly mistaken" or "wide of the mark."'" Parish v. Parish, 412 N.J. Super. 39, 48 (App. Div. 2010) (alteration in original) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)).

"[T]he conclusions that logically flow from those findings of fact are, likewise, entitled to deferential consideration upon appellate review." N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 89 (App. Div. 2006). However, the "interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

"Whether the facts found by the trial court are sufficient to satisfy the applicable legal standard is a question of law subject to plenary review on appeal." State v. Cleveland, 371 N.J. Super. 286, 295 (App. Div. 2004); see also N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017) ("[W]e review the judge's legal conclusions de novo."). In addition, no appellate deference is owed to a trial court's interpretation of a statute. Maeker v. Ross, 219 N.J. 565, 574 (2014) (citing Aronberg v. Tolbert, 207 N.J. 587, 597 (2011)); see also N.J. Div. of Child Prot. & Permanency v. Y.N., 220 N.J. 165, 177 (2014) ("[W]e need not defer to [a lower] court's interpretive conclusions.").

Turning to the substantive legal principles, the Legislature created a multipart test to determine when it is in the child's best interests to terminate parental rights. Specifically, N.J.S.A. 30:4C-15.1(a) requires the Division to prove four prongs by clear and convincing evidence, which are:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and

17

the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

These requirements "are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). "The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the specific circumstances in the given case." Ibid. (quoting In re Adoption of L.A.S., 134 N.J. 127, 139 (1993)).

John's merits brief does not specifically challenge the trial court's evaluation under prong one and focuses on the alleged error committed by the trial court in its evaluation of prongs two through four. We shall address John's specific contentions of error later in this opinion.

The Law Guardian supports termination, arguing Dr. Winston did not ignore John's willingness to participate in services, but found even if he did participate, he would still be unable to become a safe parent. The Law Guardian contends those concerns were not only because John continuously denies

responsibility for Chad's injuries but also based on his continuous denial of needing anger management services, denial of needing parenting courses and denial of other related issues. Further the Law Guardian argues Charlie has already been in foster care for four years, and delaying his permanency for the long-shot John would ever rehabilitate would only increase harm and be contrary to the four-prong test.

The Law Guardian contends Charlie was removed from John's custody because there were concerns that Chad's life-threatening abdominal injury was caused by physical abuse and removal occurred before it was disclosed the story that Mary hit Chad with a hammer was untrue. The Law Guardian also contends John's assertion that the Division did not attempt to improve their relationship contradicts the evidence and highlights when virtual visitation was going poorly, the effort was not abandoned; instead, the Division arranged therapeutic visitation in an attempt to assist.

The Law Guardian points out that the Division succeeded in December 2024 in arranging a phone call between John and Charlie. Further, the Division arranged for a psychological evaluation for John as soon as he was willing to participate and arranged for services that the expert recommended. Any other efforts would not have helped the unrebutted expert opinion unless John

completed and benefitted from therapy, anger management and parenting courses.

In summary, the trial court found the testimony of the Division employees was consistent with the four investigation binders submitted by the Division into evidence at the hearing. The court also found Dr. Winston's testimony direct, authoritative, highly credible and compelling. Moreover, the court found Charlie as mature, compelling, resilient, confident, and able.

We note, although John has not specifically challenged the trial court's analysis and findings concerning prong one, we include such for purposes of completeness and because of the overlapping nature of the prongs. To satisfy the first prong of N.J.S.A. 30:4C-15.1(a), there must be evidence that the parent caused the child harm. K.H.O., 161 N.J. at 348-49. While one single harm may be sufficient, "the focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development." Id. at 348. "In order to satisfy this prong," the Division "need not 'wait until a child is actually irreparably impaired by parental inattention or neglect[,]'" but must only "demonstrate that the parental relationship has created a harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Div. of Youth & Fam. Servs. v. L.M., 430 N.J. Super. 428, 444 (App. Div.

20

2013) (quoting N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 449 (2012)).

Concerning prong one, the court found it is "quite clear [Charlie's] relationship with [John] has caused him harm." The court relied on Dr. Winston's testimony, which it found clearly showed Charlie was physically and emotionally harmed. Dr. Winston explained she declined to undertake a bonding evaluation with John so as not to re-traumatize Charlie. The court found the record was prevalent with statements from Charlie regarding John's assaultive behavior toward him, which included assaults with boots, switches, punches, pinches and a metal action figure that left Charlie unable to move his arm for two or three days. Notably, the court found credible the Audrey Hepburn Children's house report that Charlie believes his grandmother and the rest of his father's side of the family hate him for telling the story about what happened to Chad.

We conclude there was sufficient, credible evidence in the trial record to support the court's findings that the Division proved prong one by clear and convincing evidence and its findings were not an abuse of discretion.

Under prong two, the Division must prove that "[t]he parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to

21

provide a safe and stable home . . . and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). "The second prong of the statutory standard relates to parental unfitness." K.H.O., 161 N.J. at 352. This prong requires a judge to consider whether "it is reasonably foreseeable that [a parent] can cease to inflict harm upon [a child] entrusted to their care. N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 607 (1986). In satisfying the prong's evidentiary burden, the Division may demonstrate how a parent is unable to: (1) "'provide a safe and stable home for the child and a delay in permanent placement will further the harm to the child,'" K.H.O., 161 N.J. at 347 (quoting N.J.S.A. 30:4C-15.1(a)(2)); or (2) "cure[] the initial cause of harm and will continue to cause serious and lasting harm to child." In re Guardianship of J.C., 129 N.J. 1, 10 (1992).

A judge may consider a parent's: (1) past behavior because past harm can be predictive of future abuse or neglect of another child, see J. v. M., 157 N.J. Super. 478, 493 (App. Div. 1978), and a child's mere "exposure to a parent's physical abuse of a child may well be abusive to" other children, N.J. Div. of Youth & Fam. Servs. v. Robert M., 347 N.J. Super. 44, 68 (App. Div. 2002); and (2) "delay in [securing] permanent placement" for the child because a delay is a harm in itself. K.H.O., 161 N.J. at 352 (quoting N.J.S.A. 30:4C-15.1(a)(2)).

22

John contends the trial court relied entirely on Dr. Winston's prediction that he would not engage in services "in any meaningful way" as justification for terminating parental rights, rather than actual evidence of his willingness and ability to remedy harm. John argues Dr. Winston based her opinion that he could not truly engage in services chiefly on her belief that he refused to take responsibility for causing Chad's injuries, which lacked appropriate psychological or legal foundation for this conclusion.

John contends the trial court erred by relying entirely on Dr. Winston's prediction that he would not engage in services "in any meaningful way" as justification for terminating parental rights, rather than actual evidence of his willingness and ability to remedy the harm. John asserts Dr. Winston based her opinion that he could not truly engage in services chiefly on her belief that he refused to take responsibility for causing Chad's injuries, which lacked appropriate psychological or legal foundation for this conclusion.

John further argues he expressed a willingness to comply with any service required of him, completed parenting classes during his incarceration and obtained employment immediately after release, demonstrating his resolve to reunify with his children. Additionally, he contends the record shows that the Division changed its goal to reunification rather than termination concerning he

23

and Mary, which directly contradicts Dr. Winston's assertion that he could not remedy the harm or become a fit parent in the foreseeable future for Charlie. He further contends that the trial court's reliance on Dr. Winston's unsupported opinion was misplaced, and that its findings under the four-prong test should therefore be reversed.

We conclude the Division provided evidence sufficient for the trial court to find by clear and convincing evidence that the second prong was satisfied based its specific finding that John is unwilling to or unable to provide a safe and stable home and even if he was able to provide such, the delay of permanent placement will add to Charlie's harm. As noted by the trial court's decision, Dr. Winston's testimony was authoritative and credible, and her outlook of John's potential to improve "minimal" and "very poor." In addition, the court found Dr. Winston's evaluation of John to be credible, which found him to be deceptive, suspicious, untrusting and that he would not engage in therapeutic services in a meaningful way. Moreover, the court referenced Dr. Winston's findings that John has no ability to even acknowledge he has a character flaw, much less undertaking efforts to resolve the flaws.

Turning to John's contention that the Division's plan to reunify him with Mary shows the Division has not proven the second prong to support termination

of his parental rights to Charlie, we conclude, as asserted by the Law Guardian, that Charlie's situation was distinctly different from Mary's because Charlie had been in foster care for four years, and delaying his permanency for the unlikely chance that his father would remediate would only increase the harm and be contrary to the four-prong legal standard. The record further demonstrates that John was diagnosed with a personality disorder that was extremely difficult to treat and Charlie required the security of a permanent home where his caregiver would provide consistent care and security. We agree with the trial court's finding derived from Dr. Winston's testimony, that after four years of Division placement, the permanency of adoption was essential for Charlie to obtain stability and to ensure no further harm would occur through additional reunification efforts with John. We conclude substantial, credible evidence in the record supports the court's finding that the Division satisfied prong two in this case despite the Division's reunification plan for Mary in her matter.

For prong three, our Court has held "reasonable efforts to provide services" under this prong means "attempts by . . . the [D]ivision to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure[.]" In re Guardianship of DMH, 161 N.J. 365, 386 (1999) (citing Matter of Adoption of L.A.S., 134 N.J.

A-2673-24

127, 139 (1993)). A court's "evaluation of the efforts undertaken by [the Division] to reunite a particular family must be done on an individualized basis." Id. at 390. "'Reasonable efforts' will vary depending upon the circumstances of the removal." N.J. Div. of Youth & Fam. Servs. v. F.H., 389 N.J. Super. 576, 620 (App. Div. 2007).

"[S]ervices under the third prong contemplates efforts that focus on reunification and may include consultation with the parent, developing a plan for reunification, providing services essential to the realization of the reunification plan, informing the family of the child's progress, and facilitating visitation." N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 488 (App. Div. 2012) (internal citations omitted). The services provided to meet the child's need for permanency and the parent's right to reunification must be "coordinated" and must have a "realistic potential" to succeed. Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. J.Y., 352 N.J. Super. 245, 267 n.10 (App. Div. 2002)).

Nevertheless, "[t]he diligence of [the Division]'s efforts on behalf of a parent is not measured by their success," DMH, 161 N.J. at 393, particularly where the lack thereof is due to a parent's "failure to cooperate or follow

through" with services and obligations.  <u>N.J. Div. of Youth & Fam. Servs. v.</u> <u>C.S.</u>, 367 N.J. Super. 76, 119 (App. Div. 2004).

Concerning this prong, the court recounted the Division's efforts referring John to parenting classes, psychological evaluations, and individual therapy; finding during that period, John failed to confirm visits or team meetings.  The court highlighted that even before his arrest, John was noncompliant with the services offered by the Division and supported the Division's claim that he had no intention of complying with their requests.  The court's findings further recounted that the Division provided childcare, multiple placements, resources, and translation services for meetings with Charlie's mother.  Moreover, the court detailed efforts that were made by the Division including assessment of various relatives, placement with John's mother and alternatives to termination of parental rights.

We incorporate our determinations set forth above under prong two concerning the Division's plan for reunification of John and Mary due to its overlapping nature with prong three, in addition to the above trial court findings, and conclude substantial, credible evidence existed in the record that the Division satisfied prong three by clear and convincing evidence.  The Division repeatedly referred John to services which he declined, he refused to attend

27

meetings or left the meetings early, and he did not complete intake forms despite receiving the forms nine months in advance. Additionally, the Division continuously met John while in prison to update him about Charlie and Mary. They were placed into four different resource homes over the course of a year before Charlie finally found a home with Beth. When the Division inquired into John's parenting plan, his proposed plan was to utilize his mother; despite knowing Charlie believed his grandmother hated him. Moreover, the evidence reveals the Division repeatedly inquired of Charlie whether he desired to visit his father, which Charlie continuously denied.

Turning to the fourth prong, which assesses whether termination will do more harm than good, this prong "serves as a fail-safe against termination even where the remaining standards have been met" and it "does not provide an independent basis for termination where the other standards have not been satisfied." N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 609 (2007). The prong assesses "the child's need for a permanent and stable home, along with a defined parent-child relationship." N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 226 (App. Div. 2013). A child's need for permanency is paramount under this prong. N. J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 281 (2007). As such, "[k]eeping the child in limbo, hoping for some

long-term unification plan, would be a misapplication of the law." N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001).

"When a bond exists between the child and the caretaker parent, and the biological parents cannot correct their poor conduct, the termination of their parental rights will not do more harm than good." H.R., 431 N.J. Super. at 226 (citing E.P., 196 N.J. at 108). The trial court should consider "the harm that would result from disrupting whatever bonds the child has formed." N.J. Div. of Child Prot. & Permanency v. D.C.A., 474 N.J. Super. 11, 29 (App. Div. 2022), aff'd, 256 N.J. 4 (2023). When "shown that the bond with [the] foster parents is strong and, in comparison, the bond with the natural parent is not . . . that evidence will satisfy the requirement of [prong four] that termination of parental rights will not do more harm than good to the child." K.H.O., 161 N.J. at 363. "It [is] well within the discretion of the trial court to accept the unrebutted and unequivocal opinion of the Division's expert." N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 93 (App. Div. 2013).

Previously, we have held:

> We can envision very few scenarios in which comparative evaluations would not be required. [E]ven when not used to prove harm under the second prong, it is of great significance in evaluating comparative harm under the fourth prong in showing that "termination of parental rights likely will not do more

harm than good and in sustaining [the Division]'s burden of proof.

[N.J. Div. of Youth & Fam. Servs. v. A.R., 405 N.J. Super. 418, 440 (App. Div. 2009) (internal citations omitted).]

After our careful consideration of this issue, we conclude sufficient evidence exists in the record that fits in the category where a comparative bonding evaluation is not required. We observe the most critical point here is that the comparative bonding evaluation was not overlooked, because Dr. Winston considered the bonding evaluation but declined to conduct it because she determined the contact between Charlie and John that would be required for the evaluation would "retraumatize" Charlie and not be in his best interests. This determination was supported by substantial evidence in the record including Charlie's legitimate fear of John, John influencing Charlie to lie to authorities concerning the cause of Chad's injuries, Charlie's distrust in John caused by John's failure to engage in the services necessary to repair their relationship, and John's plan of utilizing his mother as a visitation resource, despite knowing Charlie believed his grandmother hated him. In contrast, Dr. Winston's bonding evaluation of Charlie while in Beth's care leaves little doubt that he views himself as thriving under her care and stating repeatedly he desired to be adopted by Beth.

30

The evidence adduced at trial demonstrates that Charlie has a strong attachment to Beth and little to no attachment to John. Also, John was found to be unable to correct his behavior, which supports the trial court's determination that termination of John's parental rights will not do more harm than good. The court noted that Charlie is thriving, has stability, views Beth's residence as his future home, and does not wish for any other outcome than being adopted by Beth. Again, as we determined with the prior three prongs, we concur with the court's thorough findings related to the fourth prong, which were proven by the Division by clear evidence in the record.

To the extent we have not addressed any of John's remaining arguments, we conclude those arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2673-24